Pickering & Co., Inc. v. Commissioner. Norman C. Pickering and Juta Pickering v. Commissioner.
Pickering & Co. v. Commissioner
Docket Nos. 84756, 89799, 89730.
United States Tax Court
T.C. Memo 1964-72; 1964 Tax Ct. Memo LEXIS 264; 23 T.C.M. (CCH) 466; T.C.M. (RIA) 64072; March 18, 1964
*264 Thomas Shaw Hale, for the petitioner in Docket Nos. 84756 and 89799. Lester Nelson and James E. Stanton, for the petitioners in Docket No. 89730 only. Eugene L. Wilpon, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax, as follows: Year
Docket
End-
Defi-
Petitioner
Number
ing
ciency
Pickering & Co., Inc.
89799
3/31/56
$7,581.53
84756
3/31/57
422.11
Norman C. and Juta
Pickering
89730
12/31/57
2,078.73
12/31/58
1,421.01 The issue in these consolidated cases is whether certain payments made by Pickering & Co., Inc., during its fiscal years ending March 31, 1957 and 1958 to Norman C. Pickering are deductible by the corporation as payments under a covenant not to compete and, correspondingly, taxable to Norman as ordinary income. Findings of Fact Some of the facts were stipulated and they are so found. Norman C. Pickering and Juta Pickering, husband and wife, are residents of North Haven, New York. They filed joint income tax returns for the years 1957 and 1958 with the district director of internal revenue, *265 Brooklyn, New York. Pickering & Co., Inc., hereinafter called Pickering & Co., is a New York corporation, incorporated in 1946, with its principal office in Plainview, Long Island, New York. It filed its corporation income tax returns for the fiscal years ended March 31, 1955, 1956 and 1957 with the district director of internal revenue, Brooklyn, New York. Pickering & Co. has outstanding 500 shares of Class B voting common stock and 200 shares of Class A non-voting stock. Pickering Associates, Inc. (now known as Stanton Magnetics, Inc.) was formed on April 20, 1948 and since that date has held all of the common stock of Pickering & Co. From April 1, 1953 to January 4, 1957 the capital stock of Pickering Associates, Inc. was held, as follows: Norman C. Pickering
354 shares
James B. Hosmer
10 shares
Irving Cahn
130 shares
Walter O. Stanton
200 shares
Jorgen H. Isaksen
130 shares
Frank C. Powell
176 shares
Norman C. Pickering, born July 9, 1916, is an electronic engineer. After finishing undergraduate studies in electrical engineering in 1936 he worked in musical acoustics and aircraft instrumental development, did graduate work at Columbia University, *266 and was visiting professor of acoustics and electrodynamics in City College of New York from 1951 to 1954. He has written about 15 technical articles on the subject of musical acoustics and electrodynamics which have appeared in principal publications of the audio engineering and electronics industry. Norman formed a partnership with two other individuals in 1945 to exploit Norman's invention for a phonograph pickup, and the partnership was succeeded by Pickering & Co. in 1946. In November 1948 Norman was president and chief engineer of Pickering & Co., and at that time Walter O. Stanton joined the corporation as vice president and he was placed in charge of sales. Norman served as president and as chairman of the board of directors of Pickering & Co. until October 13, 1950, when he resigned those offices and took a brief leave of absence due to ill health. Norman was succeeded in said office by Walter O. Stanton. Norman subsequently returned to Pickering & Co. as director of research and as a member of the board of directors. On April 20, 1948 Norman and Pickering Associates, Inc. (the parent corporation) executed a 10-year employment agreement which was subsequently amended and *267 modified on August 18, 1952. Both of these agreements were assumed by Pickering & Co. During the period of his employment Norman was paid the following compensation: 1948
$ 6,278
1949
8,564
1950
12,950
1951
13,200
1952
23,450
1953
27,428
1954
33,366
1955
35,533
1956
36,092
Pickering & Co., during the period here relevant, was engaged in designing, producing and selling sound reproduction equipment. Patents were obtained by Norman for the phonograph pickup invented by him, and these patents were assigned to Pickering & Co. In 1956 the products of the corporation were all sold under the trade name "Pickering" and the corporation had always promoted the trade name, spending substantial amounts in advertising. The sales of Pickering & Co. were primarily to dealers in the metropolitan areas of New York, Chicago, and Los Angeles. Norman was well known to these customers of the corporation. Norman had negotiated the original contract in 1948 with the J. P. Seeburg Company, a major customer of Pickering & Co. New contracts were subsequently executed with J. P. Seeburg Company. Under the agreement in force in 1957 the J. P. Seeburg Company could terminate *268 the contract merely by failing to buy from Pickering & Co. for 60 days. For a period of time prior to January 4, 1957 Norman had not been in agreement with Walter O. Stanton, Jorgen H. Isaksen and Frank C. Powell with respect to the policies and management of Pickering & Co. and its parent corporation, Pickering Associates, Inc. After the discussions early in 1956 between Norman and Walter O. Stanton, it was agreed that Norman would sell his stock in Pickering Associates, Inc. to Pickering & Co. and terminate his employment contract. Pickering & Co. and Norman were represented by attorneys Daniel H. Kane and George A. Spater, respectively, in the negotiations that began in April 1956. Pickering & Co. officers told Kane at the outset that they wanted a noncompetition agreement from Norman. Negotiations continued until fall of 1956 when Pickering & Co. learned that Norman had arranged to take a job with Electro-Voice in Michigan. Electro-Voice, at that time, manufactured crystal phonograph pickups and moving coil loudspeakers. Pickering & Co. then ceased negotiations with Norman for a short time. On November 13, 1956 Kane mailed a first draft of a proposed agreement to Spater *269 and (at Spater's request) also mailed a copy to Norman. The draft contained detailed provisions for a covenant not to compete and an agreement for future consultation, which were separate from the stock purchase provisions. At a meeting on December 31, 1956 attended by the stockholders of Pickering Associates, Inc., including Norman, and the attorneys for both sides, the negotiations continued and the representatives of Pickering & Co. expressed concern over Norman's decision to work for Electro-Voice. A noncompetition clause in the proposed agreement was also discussed at the meeting, as well as other revisions in the earlier draft of the contract. Agreement was reached and the parties met again on January 4, 1957, for the final execution of the agreement. Further revisions were made on that date, including changes in the sections dealing with the covenant not to compete. The final agreement, dated January 3, 1957, was executed on January 4, 1957 by Norman C. Pickering, Pickering & Co. and Pickering Associates, Inc. The January 3, 1957 agreement provided, in part, as follows: WHEREAS an employment contract was entered into between NORMAN PICKERING and PICKERING ASSOCIATES on April 20, 1948 and *270 was amended and modified by an agreement of August 18, 1952, which agreements have been assumed by PICKERING CO.; and WHEREAS PICKERING CO. is a wholly owned subsidiary of PICKERING ASSOCIATES and NORMAN PICKERING is the owner of Three Hundred Fifty-Four (354) shares of the capital stock of PICKERING ASSOCIATES; and WHEREAS NORMAN PICKERING desires to sell his shares of the capital stock of PICKERING ASSOCIATES, and PICKERING CO. desires to purchase such shares; and WHEREAS a controversy has existed and now exists with respect to said employment agreement, as amended and modified, and with respect to the employment and performance of NORMAN PICKERING thereunder; and WHERAS it is the desire to the parties to avoid litigation, to amicably adjust their existing controversy and to prevent further controversies from arising by providing for an orderly termination of the relationship between NORMAN PICKERING and PICKERING ASSOCIATES and PICKERING CO. under an arrangement which will protect the property rights and business of PICKERING ASSOCIATES and PICKERING CO., which will avoid unfair competition, and which will make available to PICKERING ASSOCIATES and PICKERING CO., the services *271 of NORMAN PICKERING for the purposes of consultation and advice as hereinafter more specifically provided. NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other and good and valuable consideration, it is hereby agreed as follows: 1. The aforesaid employment agreement of April 20, 1948 between PICKERING ASSOCIATES and NORMAN PICKERING and the agreement of August 18, 1952 between PICKERING ASSOCIATES and NORMAN PICKERING amending and modifying the employment agreement, are hereby cancelled effective December 31, 1956, and all of the rights and obligations thereunder of PICKERING ASSOCIATES, PICKERING CO. and NORMAN PICKERING shall cease and terminate on December 31, 1956; and PICKERING CO. shall pay to NORMAN PICKERING the sum of $5,000.00 simultaneously with the execution of this agreement as compensation for November and December 1956. 2. For a period of four (4) years, commencing January 1, 1957 and terminating December 31, 1960, PICKERING CO. shall pay to NORMAN PICKERING a retainer at the rate of Ten Thousand Dollars ($10,000) for each calendar year. The payments shall be made on a monthly basis within thirty (30) days of the termination *272 of each month. 3. In consideration of the retainer provided for in Paragraph #2 hereof, NORMAN PICKERING agrees as follows: (a) The trade secrets and secret processes of PICKERING ASSOCIATES and PICKERING CO. shall be preserved in confidence by NORMAN PICKERING and he covenants not to use said trade secrets and secret processes and not to disclose them to others. (b) The trademark and trade name "Pickering" is the property of PICKERING ASSOCIATES and/or PICKERING CO. and NORMAN PICKERING agrees not to use the said trademark and trade name "Pickering" or any colorable imitation thereof either directly or indirectly in connection with the manufacture, use or sale of goods or services in the field of electronics including the audio field, provided that he may use his own name except to the extent prohibited in sub-paragraph (c). (c) For the period of time commencing with the signing of this agreement and terminating on December 31, 1960, NORMAN PICKERING shall not use his name or any colorable imitation thereof in connection with the manufacture, use or sale of goods or services in the audio field or any field of electronics in which PICKERING CO. and/or PICKERING ASSOCIATES have *273 been engaged to date. (d) For the period of time commencing with the signing of this agreement and terminating on December 31, 1960, NORMAN PICKERING, directly or indirectly, shall not organize, cause to be organized or participate in the organization or management of any business enterprise for the manufacture, design or sale of audio equipment nor shall he seek or obtain employment or work in such field. (e) For the period of time commencing with the signing of this agreement and terminating on December 31, 1960, NORMAN PICKERING agrees to cooperate and hold himself available at his place of residence for consultation and advice concerning matters and developments (other than those released and assigned to him in Paragraph 4 hereof) on which he worked while employed by PICKERING ASSOCIATES and/or PICKERING CO. provided, however, such consultation and advice shall be at times convenient to NORMAN PICKERING, shall not otherwise interfere with his regular employment, and provided further that any costs and disbursements incurred by NORMAN PICKERING in connection with said consultation and advice shall be paid by PICKERING CO. if they are approved in writing in advance by PICKERING *274 CO. In paragraph 5 of the agreement Norman agreed to sell to Pickering & Co. his 354 shares of stock in Pickering Associates, Inc. for the amount of $50,000, which was to be paid in 48 equal monthly installments starting at the end of January 1957 and terminating at the end of December 1960. It was also agreed that Norman would deposit the 354 shares of stock in escrow and that "[upon] payment of the forty eighth (48th) installment from PICKERING CO. to the Escrow agent, all of said shares of capital stock shall be transferred by the Escrow agent to PICKERING CO., and the parties shall be released and discharged from all further obligations under this Paragraph #5 through #5(f) of the present agreement." Pickering & Co. paid Norman $4,207 by check dated December 28, 1956 ($5,000 less withholdings for taxes and other employment benefits). Pickering & Co. also paid Norman, pursuant to the January 3, 1957 agreement, the amount of $9,999.96 in each of the years 1957 through 1959, and the amount of $10,000.12 in 1960, or a total of $40,000. Norman deposited his 354 shares of stock in Pickering Associates, Inc. with the escrow agent, and Pickering & Co. made payments to the escrow *275 agent, pursuant to the January 3, 1957 agreement, of $12,500.04 in each of the years 1957 through 1960, or a total of $50,000.16. Pursuant to the January 3, 1957 agreement, Pickering & Co. also purchased the 10 shares of stock in Pickering Associates, Inc. owned by James B. Hosmer for the amount of $2,500 (check dated January 2, 1957). Norman was never called upon from January 3, 1957 through 1960 by either Pickering & Co. or Pickering Associates, Inc. to render any services as a consultant or to give any advice concerning matters and developments on which he had worked while employed by either of the two corporations. In December 1956 Norman had decided to form a new company with several other individuals to manufacture electric clocks, and ultimately the new company was formed. In its corporation income tax returns for the fiscal years ended March 31, 1957 and 1958 Pickering & Co. deducted as ordinary and necessary business expenses the payments made to Norman in those fiscal years under paragraphs 2 and 3 of the January 3, 1957 agreement, which called for a total payment of $40,000 over a 4-year period. Respondent disallowed these deductions ($2,500 in the fiscal year ended *276 March 31, 1957 and $9,999.96 in the fiscal year ended March 31, 1958). Respondent's determination reduced the net operating loss carry-back of Pickering & Co. from its fiscal year 1958 to prior fiscal years. Norman reported all of the payments received by him from Pickering & Co. in 1957 and 1958 as proceeds from the installment sale of his 354 shares of stock. In his 1957 return Norman explained the transaction as follows: Sales Price
$90,000.00
Basis
14,160.00
Profit
$75,840.00
% of profit
84.267%
Proceeds - 1957
$20,625.00
Profit - 1957
$17,380.06 Similarly, Norman reported a capital gain of $18,960.07 in his 1958 income tax return. Respondent determined "that of the $90,000.00 reported on your returns for the [years] ended December 31, 1957 and December 31, 1958 as the sales price of 354 shares of Pickering Associates, Inc. sold to Pickering and Company, Inc., * * * $40,000.00 represents ordinary income and not payments for the stock." Opinion The sole issue is whether a portion of the payments to Norman in 1957 and 1958 by Pickering & Co. under the January 3, 1957 agreement were, in fact, for consulting services and a covenant not to compete, *277 in which case the payments would be taxable as ordinary income to Norman and amortizable by Pickering & Co. Norman contends that all of the payments under the agreement ($90,000 over a 4-year period) represent the purchase price for his stock and, to the extent of gain realized, are taxable only as capital gains. Pickering & Co., relying upon the express provisions of the agreement, contends that $50,000 represents the purchase price of Norman's stock and $40,000 represents the price for the consulting agreement and the negative covenants. [1] Respondent adopts the position taken by Pickering & Co. Where the covenant not to compete accompanies the sale of a going business, problems of segregating the covenant from other items transferred arise. Where it can be said the covenant has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired, the covenant is regarded as non-severable with the consequence that the entire proceeds of the sale are taxable as capital *278 gain. . However, the situation is quite different where the covenant not to compete accompanies the sale of stock. The good will of the business is not being transferred. If the contract for the sale of stock also deals with a covenant not to compete, it is dealing with two separate items. If the covenant is separately made and separately bargained for and part of the total consideration can be said to have been received for the covenant, then that consideration is ordinary income. , affirming ; ; , affd. . Norman argues that the covenant not to compete was not severable from the sale of the stock and consequently the entire $90,000 should be considered as the purchase price of the stock. There is ample evidence in the record to show that the covenants were treated as a separate item, that the attention of both parties was directed to such item, *279 and that the agreement accurately reflects the intent of the parties. Stanton, an executive officer of Pickering & Co., testified that, because of disagreements, it was decided to buy Norman's stock. Stanton told Norman "that I felt that we could not afford - we could not withstand competition from him in the field, but were willing to pay to avoid competition." The attorney who conducted negotiations for Pickering & Co. testified that "I was first instructed to try to get some relationship arrangement over a five-year period to keep Norman from competing in their fields of operation, and also to refrain from using his own name in a related business." Throughout the negotiations the covenant not to compete was kept separate and apart from the purchase of the stock, and the tax consequences of the covenant were discussed by the attorneys for the parties at various times throughout the negotiations. The first draft of the agreement in November 1956 contained explicit and detailed provisions for the covenant not to compete as well as a price to be paid for such covenant. Norman was shown a copy of the first draft, which then underwent revisions, and even on the day the agreement was finally *280 executed (January 4, 1957) the parties made changes in the wording of the provisions for the covenant not to compete. It is also apparent that the covenant not to compete was meaningful. Norman C. Pickering was about 41 years old in 1957, with no intention of retiring. He was well known to customers in the audio field and, quite significantly, the products of Pickering & Co. were sold in 1956 under the trade name "Pickering". In the fall of 1956, during negotiations, Norman arranged to work for Electro-Voice in Michigan, a manufacturer of crystal phonograph pickups and moving coil loudspeakers. Pickering & Co. also manufactured a phonograph pickup which had been invented by Norman. Stanton testified that Electro-Voice was "one of our most vigorous competitors" and that its advertising "directly pointed at our product." The covenant not to compete was obviously of real concern to Pickering & Co. Norman argues that $50,000 is an unrealistic price for his 354 shares of stock in Pickering Associates, Inc., [2] or about $141 a share, in view of the assets and earning capacity of Pickering & Co. as demonstrated by the record. To justify a price of $254 a share ($90,000 divided by 354), *281 Norman argues on brief that the stock had a book value of $179 a share based on the "net asset value" of Pickering & Co. Norman then argues that this figure is too low since it does not include any value for the patents held by Pickering & Co., nor does it include any amount for good will, and that if these items were included among the assets of Pickering & Co. the book value of the stock would be appreciably higher, i.e., close to $254 a share. Norman also argues that the earning record of Pickering & Co. supports a value of the stock in excess of $179 a share. Pickering & Co. disputes these valuations and, in fact, uses the after-taxes earnings figures of Pickering & Co. for the fiscal years ending March 31, 1953 through 1957 to show that the per share value of the stock during the period before us was $141.47 (based on a multiplier of seven times average earnings of $20.21 per share). Under the facts of this case, we do not feel it is necessary to deal exhaustively with the valuation problem. In effect, we would be re-enacting the entire negotiating *282 process of the two parties that led to the January 3, 1957 agreement. We are not ultimately concerned with the valuation placed by the parties on the covenant not to compete or on the 354 shares of stock. In , we said: we have concluded that the written contract accurately reflected the agreement of the parties and that that agreement was reached at arm's length. In the circumstances, it is not incumbent on the Court to disturb the allocation of purchase price made by the parties themselves. * * *
the question, * * * is not whether the covenant had a certain value, but, rather, whether the purchasers paid the amount claimed for the covenant as a separate item in the deal and so treated it in their negotiations. * * * To the same effect, We find that the covenant not to compete (as well as the consultation agreement) was treated by the parties as items distinct and separate from the sale of the stock, that the agreement as to these items was reached in arm's-length negotiations, and that the January 3, 1957 agreement correctly reflects the consideration to be paid for the separate *283 items. We hold that the amounts paid by Pickering & Co. to Norman for the consultation agreement and the covenant not to compete during the years before us (a total of $40,000 to be paid over a period of four years) are taxable as ordinary income to Norman and are amortizable by Pickering & Co. To give effect to concessions made by the parties, Decisions will be entered under Rule 50. Footnotes
1. Whether the payments are deemed to be for consultation services or for a covenant not to compete, they are, in both cases, taxable to Norman as ordinary income.↩
2. It appears that the stock of Pickering & Co. was the only asset held by Pickering Associates, Inc. as of March 31, 1956.↩